RECEIVED
FEB - 1 2018
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| SHALENA CARTER | CIVIL ACTION NO. 6:16-0611 |
| VERSUS | UNASSIGNED DISTRICT JUDGE |
| KIRK FRITH, ET AL. | MAGISTRATE JUDGE WHITEHURST |

## RULING

Before the Court in this civil rights action is a Motion for Partial Summary Judgment filed by Defendant Koby O'Neal. [Doc. 41]. Pursuant to the motion, O'Neal seeks dismissal of Plaintiff Shalena Carter's claim, brought pursuant to 42 U.S.C. § 1983, alleging she was denied access to medical treatment while incarcerated by the State of Louisiana in violation of her rights under the Eighth Amendment to the United States Constitution. For the following reasons, the motion is DENIED.

I.  **BACKGROUND**

On or about September 14, 2014, Carter was arrested for driving while intoxicated ("DWI") and was incarcerated as a pretrial detainee at the Vermilion Parish Correctional Center ("VPCC"). On May 4, 2015, Carter pleaded guilty to third offense DWI and was sentenced to one year of imprisonment. On May 5, 2015, Carter was transferred to the Richland Parish Detention Center ("RPDC"), where she remained until her release on September 26, 2015.

At the time of Carter's arrest, she was under the care of several physicians for gastrointestinal issues, COPD, high blood pressure and cervical disc disease.[1] Carter additionally "was diagnosed with a bad gallbladder and was scheduled for gallbladder removal." [Doc. 1 at ¶ 6; *see also* Doc. 1-2]. At the time of her arrest, Carter was prescribed inhalers, oxygen on an as needed basis, and multiple prescription medications.[2] According to Carter, she advised VPCC that her physician had previously indicated that some of her symptoms were a result of her gallbladder and that removal of her gallbladder had been recommended. Carter provided VPCC with a list of her medications, but VPCC refused to provide Carter with her prescribed medications. Carter contends VPCC denied her "medical treatment for COPD, blood pressure and for what was ultimately determined to be a chronically diseased gallbladder." [Doc. 43-11 at 1]. At the time of her transfer to RPDC, VPCC was treating Carter with Omeprazole for GERD and Colace, which is a stool softener. Carter contends these medications failed to provide any relief of her symptoms.

According to Carter, during intake at RPDC she immediately provided prison officials with a list of her prescribed medications, advised officials she had not been receiving same at VPCC, and further advised she was experiencing pain and discomfort due to the lack of treatment at VPCC. Carter alleges at intake her stomach was distended, her face was swollen and she was unable to keep down solid food.

---

[1] Prior to her arrest, Carter had been declared physically disabled by the Social Security Administration due to cervical disc disease and fourth stage COPD.

[2] At the time of her arrest, Carter was prescribed medications for acid reflux, fluid retention, high blood pressure, antibiotics for an infection, steroids for "maintenance inflammation," five medications for COPD in addition to oxygen, a muscle relaxer, Xanax, a sleeping aid, oxycodone, and a stool softener. [Doc. 1 at ¶ 7].

According to Carter, she was introduced to Koby O'Neal, the paramedic assigned to her dormitory, almost immediately upon entry into the facility. Due to the unavailability of a bed, she was initially placed in solitary confinement. O'Neal was the only official who made contact with Carter during the initial period of isolation. Throughout her detention at RPDC, Carter's primary contact with health care professionals employed by the institution was through O'Neal. She interacted with O'Neal almost daily, as he provided her medications and addressed her numerous medical complaints. According to Carter, O'Neal remained unsympathetic to her medical needs during her entire term of incarceration, refused to assist her in obtaining medical treatment, and ignored her health complaints.

Upon Carter's release from RPDC, she immediately set up an appointment with Dr. Claude Meeks, her primary care physician, and was subsequently examined by him on October 8, 2015. In light of her symptoms, Dr. Meeks immediately referred Carter for additional testing and an ultrasound. On October 21, 2015, Carter was seen by Dr. Weston Miller (a general surgeon), who diagnosed her with Acute and Chronic Cholecystitis.[3] Two days later, Dr. Miller performed a laparoscopic cholecystectomy, thereby removing Carter's gallbladder. Cater asserts during surgery she contracted pneumonia and was placed on life support. On October 29, 2015, Carter had a second surgery to remove additional infection from her gallbladder. After the second surgery, Carter's lung collapsed, which she attributes to "the neglected state of [her] lungs after not having received any medication for the one year that [she] was incarcerated." [Doc. 43-11 at 3]. Thereafter, Carter went

---

[3]Cholecystitis is inflammation of the gallbladder. If left untreated, cholecystitis can lead to serious, sometimes life-threatening complications, such as a gallbladder rupture. Signs and symptoms of cholecystitis may include: severe pain in the upper right or center abdomen, tenderness over the abdomen when it is touched, nausea, vomiting, and fever. *See* https://www.mayoclinic.org/diseases-conditions/cholecystitis/symptoms-causes/syc-20364867 (last visited January 25, 2018).

into a coma and remained on a ventilator and life support for several weeks. Carter remained in the intensive care unit until November 25, 2015. She was released from the hospital on December 5, 2015.

On May 4, 2016, Carter brought this suit against multiple defendants, alleging violations of her Constitutional rights, as well as claims of negligence under Louisiana state law.[4] With regard to O'Neal, Carter asserts he violated her rights under the Eighth Amendment to the United States Constitution by denying her proper medical care while incarcerated at RPDC. Pursuant to the pending motion, O'Neal seeks dismissal of that claim.[5]

## II. LAW AND ANALYSIS

### A. Standard of Review

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010).

---

[4]More specifically, Carter brought claims against various officials and employees of VPCC, as well as the Vermilion Parish Police Jury and its President, Ronald Menard, for violations of her rights under the Fifth and Fourteenth Amendments to the United States Constitution and "for failing to protect Carter's right to be free from cruel and unusual punishment." [Doc. 1 at ¶ 29]. She additionally brought claims against various officials and employees of RPDC (including Koby O'Neal), as well as the Richland Parish Detention Center, for violations of her rights under the Eighth Amendment to the United States Constitution. *Id.* at ¶ 40. On March 30, 2017, the Court dismissed Carter's claims against Ronald Menard and the Vermilion Parish Police Jury. [Doc. 24].

[5]O'Neal does not address Carter's claim of state law negligence in his motion and supporting brief, and therefore, that claim remains pending for trial.

As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.

*Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir.1994) (internal citations omitted).

When reviewing evidence in connection with a motion for summary judgment, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (court must view all facts and evidence in the light most favorable to the non-moving party). "The evidence, including factual allegations set forth in verified complaints, is viewed 'in the light most favorable to the nonmoving party, but conclusional allegations and unsubstantiated assertions may not be relied on as evidence.'" *Butts v. Martin*, 877 F.3d 571, 581-82 (5th Cir. 2017)(quoting *Carnaby v. City of Hous.*, 636 F.3d 183; 187 (5th Cir. 2011); and citing *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003)). "Credibility determinations are not part of the summary judgment analysis." *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002). Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004)(alterations in original)(quoting *Celotex v. Catrett*, 477 U.S. 317,

322 (1986)).

B.  **Civil Action for Deprivation of Rights**

Title 42 U.S.C. section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights; it merely provides a method for vindicating already conferred federal rights." *Bauer v. Texas*, 341 F.3d 352, 357 (5th Cir. 2003). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). In this matter, Carter contends O'Neal, acting under color of state law, violated her Eighth Amendment rights to be free of cruel and unusual punishment.

C.  **Prohibition Against Cruel and Unusual Punishment Under the Eighth Amendment**

The Eighth Amendment of the United States Constitution states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.[6] "Prison officials violate the Eighth Amendment's ban on cruel and unusual punishment when they show deliberate indifference to an inmate's serious medical needs." *Grogan v. Kumar*, 873 F.3d 273, 277 (5th Cir. 2017) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "A

---

[6]The Eighth Amendment is made applicable to the States by the Fourteenth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 101 (1976).

serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006). Non-life-threatening injuries constitute a serious medical need where the injuries induce severe pain. *Thomas v. Carter*, 593 Fed.Appx. 338, 342 (5th Cir. 2014) (citing *Gobert* at 349; *Harris v. Hegmann*, 198 F.3d 153, 159-60 (5th Cir. 1999)).

Deliberate indifference lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer v. Brennan*, 511 U.S. 825, 836 (2012); *see also Id.* at 835 (Deliberate indifference "describes a state of mind more blameworthy than negligence," but "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."). To show a violation of the Eighth Amendment's prohibition against cruel and unusual punishment, a plaintiff must prove: (1) objective exposure to a substantial risk of serious harm; and (2) prison officials acted or failed to act with deliberate indifference to that risk. *Gobert* at 345-46 (citing *Farmer* at 834); *see also Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir. 2002). "The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the jail officials were actually aware of the risk, yet consciously disregarded it." *Lawson, supra* (citing *Farmer* at 837, 839). A showing of deliberate indifference requires a plaintiff to "submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."[7] *Gobert* at 346 (citation and internal quotation marks omitted).

---

[7] Acts and omissions that are insufficient to establish deliberate indifference include: unsuccessful medical treatment, a misdiagnosis, a prisoner's disagreement with his medical treatment, absent exceptional circumstances, and whether to provide additional treatment. *Gobert* at 346.

"[D]eliberate indifference is impermissible whether it 'is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care. . . ." *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987) (quoting *Estelle* at 104-05). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer* at 842 (internal citation omitted).

For purposes of this motion only, O'Neal assumes Carter had a serious medical need and that O'Neal was aware of same. [Doc. 41-2 at 10]. Thus, O'Neal argues Carter cannot carry her burden of demonstrating by competent summary judgment proof that O'Neal was "deliberately indifferent to the serious medical need." *Id.*

### III. ANALYSIS

O'Neal contends Carter cannot show he was deliberately indifferent to her serious medical needs. In support of his position, O'Neal asserts he "responded to each sick call request and provided medications and counseling in an effort to alleviate Carter's symptoms."[8] *Id.* at 11, 19. O'Neal additionally cites to a portion of Carter's deposition testimony where she was asked about an order requiring a special diet when she was transferred to RPDC. When asked whether her diet was to include broth, Carter responded as follows:

---

[8] According to O'Neal's affidavit, on May 16, 2015, Carter was provided Zantac for her complaint of acid reflux. [Doc. 41-3 at ¶ 9]. On June 12, 2015, she was provided with Tylenol due to her complaint of gallbladder pain. *Id.* at ¶ 10. On July 17, 2015, she was again provided Zantac. *Id.* at ¶ 12. On September 11, 2015, she was provided Tylenol for stomach pain. *Id.* at ¶ 15. On September 12, 2015, she was provided with Diflucan, Tylenol and Ibuprofen. *Id.* at ¶ 16. On September 15, 2015, she was provided with a GI cocktail with Bentyl. *Id.* at ¶ 17. On September 18, 2015, Carter was placed on a liquid diet "to help prevent symptoms." *Id.* at ¶ 18.

There was no dietary for broth. The broth ended up at the end at about the last three weeks before I got out of Richland Detention Center because Mr. Koby O'Neal realized at that point that this was very severe. By the time I got to Richland at the end, I was crying, couldn't sleep. I mean, I kept writing an order, order, order, sending it to the window, "I need help. I need a hospital. I need a doctor. I am not going to make it." **First, I don't think Mr. Koby O'Neal thought it was as serious as it was, you know, and at that point when I got there, I was supposed to just be there for a little while and going home**.

*Id.* at 16 (emphasis in original) (citing Doc. 41-4 at 2-3); *see also* Doc. 41-3 at 9. From this testimony, defendant concludes, "Clearly, Koby O'Neal cannot be accused of deliberate indifference when Carter, herself, is of the opinion that O'Neal was not aware of the alleged severity of her condition." *Id.*

O'Neal additionally points to portions of the deposition testimony of Carter's primary care physician, Dr. Claude Meeks, in support of his motion. According to the testimony of Dr. Meeks, when he saw Carter twelve days after her release from RPDC, there was nothing emergent about her medical condition that day, and Carter did not advise him she had been denied medical attention while incarcerated. *Id.* at 17 (citing Doc. 41-5 at 2, 6, 7). Dr. Meeks testified there are non-surgical ways to treat gallbladder symptoms such as diet and antibiotics, and further testified a GI cocktail is an appropriate treatment for abdominal pain. *Id.* at 18-19 (citing Doc. 41-5 at 3-5). According to O'Neal:

> The . . . testimony of Dr. Meeks establishes two important facts:
>
> (1) The treatment modalities provided to Shalena Carter, i.e., bland diet and GI cocktail, are acceptable treatments; and
>
> (2) Shalena Carter's condition (even after discharge from Richland Parish Detention Center) was not emergent, i.e., it did not require emergency surgery.

*Id.* at 19.[9]

By her opposition, Carter contends there are genuine issues of material fact with regard to whether O'Neal "acted with deliberate indifference in failing to provide medical care or address her deteriorating medical condition. . . ." [Doc. 43 at 5]. Carter asserts she advised O'Neal at intake that she had serious medical conditions and continued to remind him "regularly of the serious medical need and her deteriorating condition." [Doc. 1 at ¶ 17] According to Carter:

> [She] suffered symptoms from her arrival at the facility on May 5, 2015 and continued to experience symptoms up to the date of her release on September 26, 2017 [sic]. She presented to the Richland Parish Jail [sic] with a distended stomach and swollen face. She was in pain and complaining of need of treatment when she was placed into solitary confinement upon her arrival. She presented a list of medication to Richland Parish on two separate occasions and never received medication for high blood pressure or for the symptoms of COPD. She made repeated requests for assistance many of which were lost or denied. . . . Carter was never seen by a doctor during her tenure at Richland Parish nor did she undergo any physical testing or examination by staff.

[Doc. 43 at 7]. Carter further contends O'Neal threatened to put her in solitary confinement if she did not stop her complaints of gallbladder pain. [Doc. 43-3 at 1-2]. Carter testified when she complained she felt she was going to die, O'Neal responded that she had a debt to pay to society and he could accommodate her by sending her home in a body bag. [Doc. 43-4 at 2].

Carter contends she lodged complaints with O'Neal and others almost daily, and further asserts the log of her requests for medical assistance submitted by O'Neal is incomplete. [Doc. 43 at 10-11; Doc. 43-11 at 2]. According to Carter, she complained on numerous other occasions, including formal grievances to the warden, three attempts to reach the Department of Corrections

---

[9]Again, Carter was not provided with a GI cocktail until September 15, 2015 (approximately four and a half months after she arrived at RPDC), and she was not provided broth until September 18, 2015. *See* note 8, *supra*.

in Baton Rouge, one attempt to contact the sentencing judge, and "repetitious informal complaints to Koby O'Neal expressing to him the lack of relief [she] was receiving from medication or lack of medication being provided." Despite all of these complaints, Carter was never seen by a physician. [Doc. 41-11 at 2; *see also* Doc. 41-4 at 2; Doc. 43 at 11]. Rather, O'Neal merely continued the same unsuccessful course of treatment as VPCC for almost five months, and ultimately, according to Carter, his only assistance was to take away solid food. *Id.* at 13. Carter asserts VPCC's improper treatment did not give officials at RPDC "the right to abandon their responsibility to the inmate or to fail make [sic] independent determinations of an inmates health," particularly where "Carter was showing objective signs of gastrointestinal and pulmonary distress immediately upon her arrival." [Doc. 43 at 9]. While Carter does not fault O'Neal for initially following the same course of treatment as VPCC, she asserts his failure to have her evaluated or to provide her with an alternative treatment after her condition persisted and worsened over the course of several months constitutes deliberate indifference. *Id.* at 14.

Like O'Neal, Carter also relies on portions of Dr. Meeks deposition testimony in support of her claim. According to Dr. Meeks' testimony, if a patient presents with prolonged stomach distention, a reasonable healthcare provider would further evaluate the patient and conduct imaging. *Id.* at 15 (citing Doc. 43-10 at 1). Carter additionally notes at her first visit with Dr. Meeks after leaving RPDC, he immediately sent her for additional testing due to her "right upper quadrant tenderness," which, according to Dr. Meeks, is an indicator of gallbladder issues. *Id.* at 16 (citing Doc. 43-6 at 1-2). Dr. Meeks testified if a patient presented with nausea and vomiting while on a bland diet he would order an ultrasound and continue to "work it up . . . if it was persistent." *Id.* at 16 (citing Doc. 43-7 at 1). Dr. Meeks testified he rarely gives a patient a GI cocktail more than once,

as its purpose is only to alleviate the symptoms. After one GI cocktail, he then runs labs and tests. *Id.* at 17 (citing Doc. 43-8 at 1). Dr. Meeks testified he would not continue to give a GI cocktail without, at a minimum, conducting a physical examination. *Id.* at 18 (citing Doc. 43-9 at 1).

Viewing the facts and evidence in the light most favorable to Carter as required when reviewing a motion for summary judgment, *Feist*, 730 F.3d at 452, the Court finds Carter has shown an issue of material fact exists warranting trial with regard to whether O'Neal was deliberately indifferent to Carter's serious medical needs during her incarceration at RPDC. Carter was introduced to O'Neal almost immediately upon entry into RPDC. [Doc. 43-11 at 1]. At that time, Carter's stomach was distended, her face was swollen, and she was unable to keep down solid food. *Id.* at 2. During intake health screening, Carter advised prison officials that she had high blood pressure, asthma, cardiac disease, fourth stage COPD, and a "bad gallbladder" which "needed to be removed." [Doc. 41-3 at 9, 13; Doc. 41-6 at ¶ 13]. She additionally advised prison officials, including O'Neal, of her prescribed medications, that she had not received her prescribed medications at VPCC, and that she was in pain due to the lack of treatment at VPCC. [Doc. 41-11 at 2; *see also* Doc. 1 at ¶¶ 17, 19; Doc. 41-3 at 21]. According to Carter, after review of her intake health screening, she was told that the Department of Corrections was not going to pay for her medical treatment. [Doc. 1 at ¶ 17].

While O'Neal admits Carter complained on six occasions of gallbladder pain [Doc. 41-3 at ¶¶ 9-10, 12, 15-17], Carter has submitted evidence (by way of her deposition and affidavit) that she complained on numerous other occasions, including formal grievances to the warden, three attempts to reach the Department of Corrections in Baton Rouge, one attempt to contact the sentencing judge, and "repetitious informal complaints to Koby O'Neal expressing to him the lack of relief I was

receiving from medication or lack of medication being provided."[10] [Doc. 41-11 at 2; *see also* Doc. 41-4 at 2]. According to Carter, O'Neal threatened to put her in solitary confinement or send her home in a body bag if she did not stop her complaints. [Doc. 41-11 at 2; Doc. 41-3 at 1-2; Doc. 43-4 at 2]. Carter's intake records at RPDC state she was to be provided with a special diet which included broth. [Doc. 41-3 at 9]. However, Carter contends she was not provided broth until the last three weeks of her incarceration at RPDC, and then only due to her rapidly deteriorating medical condition. [Doc. 41-4 at 2; Doc. 43-3 at 1]. According to Carter, by that time she was crying, could not sleep, could no longer eat solid food, and was continually asking for medical attention. [Doc. 41-4 at 2; Doc. 43-3 at 1]. Carter was never seen by a physician during her stay at RPDC. [Doc. 1 at ¶ 23; Doc. 45 at ¶ 28].

In light of the foregoing, the Court finds Carter has demonstrated by competent summary judgment proof that there is a genuine issue of material fact with regard to whether O'Neal was deliberately indifferent to Carter's serious medical needs. Carter has pointed to evidence in the record showing O'Neal was aware of the risk of serious harm to Carter by way of her intake health screening, numerous complaints, and objective symptoms. She has further pointed to evidence in the record showing O'Neal refused to assist her in obtaining medical treatment and ignored her complaints. *Gobert* at 346 (deliberate indifference requires a plaintiff to "submit evidence that prison officials refused to treat him, ignored his complaints, . . . or engaged in any similar conduct that

---

[10]The Court notes O'Neal's affidavit states Carter complained of gallbladder pain on six occasions. [Doc. 41-3 at ¶ 9] The RPDC medical records attached to the affidavit reflect only five complaints of gallbladder pain. [Id. at pp. 16-18, 23-24, 26] While O'Neal attests he provided Carter with Zantac on May 16, 2015 due to her complaints of acid reflux, no medical record corresponding to that date has been provided. The Court finds this further supports Carter's assertion the medical records supplied by defendant are incomplete.

Page 13 of 14

would clearly evince a wanton disregard for any serious medical needs"). Accordingly, the motion for summary judgment is DENIED.

## IV. CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment submitted by defendant Koby O'Neal [Doc. 41] is DENIED.

ALEXANDRIA, LOUISIANA, this _1st_ day of February, 2018.

**DEE D. DRELL**
**UNITED STATES DISTRICT JUDGE**